Chief Justice Robertson
delivered the Opinion of the Court.
This case was decided at the last Spring Term. But soon after the Opinion was delivered, the court was informed, that Mrs. Gil-man, one of the defendants, had previously departed this life; upon which her death was suggested upon the record, and a suspension of the opinion and decision ordered. The case again coming up, in the call of the docket, at this term, and it appearing that no administration had been granted of the estate of Mrs. Gilman, and' that, it was not likely that there would ever be any personal representative, against whom there could be a revivor, the matter of abatement was further considered; and the court held, that, as Peck and Gilman were sued jointly, ex contractu, and obtained a joint judgment against Marshall, for costs — the right to collect those costs, survived to the survivor. Peck; and consequently the writ of error did not abate by thq death of Mrs. Gilman. The order suspending the opinion and decision, was, therefore, now set aside.
Marshall brought an action of covenant (jointly,) against Peck and Gilman, on the following writing:—
“I promise to pay Lewis Marshall one thousand and seventy five dollars in Commonwealth’s Bank notes, in manner following: two hundred and sixty eight dollars seventy five cents in four months; the like sum each four months thereafter until the whole is paid; the whole sum to bear interest from the date. Witness my hand this 1st June, 1827.” (Signed) John Peck.
“I, Mary Gilman, guarantee the full performance of the above contract.” (Signed) Mary Gilman.
The defendants demurred to the declaration, and filed two pleas in bar: 1. that “the covenant was executed without any good or valuable consideration:” 2. a special plea, averring, in substance, that Marshall sold to Peck and to James Graves, a share in the stock of “a Supposed invention” for manufacturing hemp, which he in *610 duced them, by '■'■false representations” as to its utility and probable results, to believe to be of immense value; that the covenant was given in consideration of a part of Peck’s half of the price for the share, and for no other consideration; and that, afterwards, a full experiment resulted in proving that the “invention and stock” were of no value whatsoever.
Decisions of the circuit court— and,
Questions here.
A note, or other contract, signed by one person, and a guarantee of the payment, or performance, annexed thereto, and signed by another person, are separate contracts— upon which no loint action can he maintained.
The court overruled the demurrer to the declaration, and also overruled demurrers to the pleas; and thereupon, issues were concluded on the pleas, and verdict and judgment were rendered in bar of the action.
Two questions are presented by the record: First, is the declaration good? Second, did the circuit court err in instructing the jury?
First. Mary Gilman and John Peck were not joint covenantors. She was no party to his covenant. She did not undertake as an ordinary surety. She did not, as a co-party, covenant to pay the money which he undertook to pay, or as he agreed to pay it. His covenant was single, arid-binding on himself alone. She did not covenant to pay Commonwealth’s notes on the days stipulated bv him; but agreed only to be responsible for his defalcation. A guarrantee imports, ex vi termini, a collateral undertaking. It is, though a concurrent, only an accessary agreement, distinct from a principal contract of which it assures performance by the primary undertaker, or indemnity for his failure to perform. The two agreements, though separate and distinct, are usually commensurable and simultaneous. But there can be no breach of the guarantee until after a non-performance of the principal agreement- Mrs. Gilman’s covenant is as distinct from Peck’s as it would have been had they been written on different papers, or signed and delivered at different times. He could not be sued on her covenant of guarantee. She cannot he sued upon his. The two agreements cannot, he so blended as to constitute but one, binding equally and alike on her and him. They are not identical, and, therefore, cannot be joint. 1 Wheaton’s Selwyn, 35; Leonard vs. Vridenburgh, 8 John. 29; Ely vs. Bibb, 4 J. J. Mar. 71. The guarantee is an entire and individual agreement, not a constit *611 uent part of Peck’s contract, though it may be déemed a “branch” from it. Each is sole and complete by itself; and there could not have been a simultaneous breach of both. A joint action cannot, therefore, be maintained against Peck and Gilman. She did not undertake to pay; but only covenanted that he would punctually do what he had undertaken. She can be sued on her guarantee only, and he upon his separate covenant.
A plea of a failure of consider, ration would not be good when the consideration (such' as it was,j was exe^ cuted.
Instruction-
Falso represen» tations oy the senei, as to the value of a commodity, or as to any matter that the buyer can ascertain by ordinary vigilance or enquiry, do not subject the' sener to any legal liability.
Wherefore, it seems to this court, that the circuit court erred in overruling the demurrer to the declaration.
If the special plea should be deemed a plea of failure of consideration, it would not be good, because, as the consideration was executed, if any binding consideration ever existed, it did not fail in consequence merely of the unproductiveness of the stock. But, as the facts alleged in that plea were substantially proved, and there was an issue on the general plea of “no consideration,” whether or not the proof authorized the deduction that there had been no consideration, is the only material enquiry.
The circuit court instructed the jury that, if they believed, that the sale of the share in the invention was the only consideration of the note, and that the invention was of no value, they should find for the defendants.
The instruction left the jury free to enquire whether there was any other consideration than the sale of a share in the invention, and consequently, this court need not determine whether the prooí shewed that an interest in machinery, or any other thing, formed a part of the consideration.
Neither of the pleas imputes fraud. The simple allegation that Marshall made false representations as to the value of the invention, does not amount to an imputation of fraud: Simplex commendatio non obligat. A false affirmation, respecting a matter (such as value) which Peck had an opportunity of ascertaining for himself by ordinary vigilance or by enquiry, could, per se, have no eliect on-the legal rights of the contracting parties, even had such affirmation been made with an intention to deceive. In such a case, ucaveat emplor” 'would effectually operate.
It appears that, prior to Peck’s purchase, the stockholders had made some experiments with imperfect ma *612 chinery, which encouraged them, or some of them, to entertain an opinion, that the invention would prove to be of great utility; that Marshall expressed an extravagant opinion of its value to Peck; that specimens of some of the experimental fabrics were exhibited, and that Peck had seen the machinery in operation, and examined it before he closed the negotiation for the purchase, or rather before he ratified an initiative contract, vvnich had been made for him in his absence.
Proof of fraud is inadmissible, where there is no plea charging fraud.
Xu the sales of commodities, there is, in general, no implied warranty of soundness,quality or value.— Sales of provisions, medicines, and sales by sample, are exceptions. There is an implied warranty in all sales, that what is sold exists--susceptible of being transferred; that the seller (if in possession) has a good title; that a negotiable note sold, is genuine. Ifthereisa failure in either of these points, the consideration paid maybe recovered back, by assumpsit.
Wherefore, whether we consider tiie special plea, or the proof, neither the erroneousness of Marshall’s opinion, nor the falsehood of his affirmation, as to value merely, 'can lie deemed material. See 1 Wheaton’s Selwyn, 484; Bayly vs. Merrill, Cro. Ja. 386. Perry vs. Aaron, 1st Johnson’s Reports, 129; Bayard vs. Malcom, 2 Ib. 50; Holden vs. Dakin, 4 Ib. 421; Davis vs. Meeker, 5 Ib. 354; Sands vs. Taylor, Ib. 395; 2 Com. on Con. 265.
And if there had been vitiating fraud, as neither of the pleas charges such fraud, proof of facts tending to establish it would have been inadmissible. Davis vs. Young, 1 Mon. 384.
As, then, the only issue was, whether or not there was any valuable consideration, the instruction of the circuit court cannot be objected to, unless its principle be false; or, in other words, unless the court erred in assuming, as it did in the instruction, that, if the “stock or invention” was, in fact, of no value, there was no binding consideration for the covenant. As already suggested, we shall consider the instruction, as thus stated, without enquiring whether there was proof of any other consideration.
In the opinion of this court, the assumption in the instruction, whether it be considered in the abstract, or in reference to the proof, was erroneous.
The civil law maxim — that a'sound price draws after it the implication of a warranty that tiie thing for which it was given is also sound or valuable — has never, since the days of Lord Mansfield, been admitted to be a doctrine of the common law. .
Aceordingto the principles of.the common law, there is no implied warranty of soundness, quality, or value— *613 except in a few classes of contracts which are regulated by peculiar reasons of policy; such, for example, as sales of provisions or medicines, and sales by sample. (See the cases, supra.)
Whenever it is ascertained that there was no valuable consideration for a sale, or that the consideration had failed, indebitatus assumpsit may ,be maintained for any money which had been paid on the contract to the vendor. See 2 Com. on Con. from page 51 to page 83 inclusive, and the cases therein cited.
JBut we have not seen any case ih which, without either fraud or warranty, express or implied, such an action was maintained upon the ground that the thing for which the money liad been paid, was in fact of no value. There must be an actual subject matter, legally susceptible of being sold; and generally there is an implied warranty that the subject of the contract has existence. If the vendor be in possession at the sale, a warranty of title or right to sell will be also implied; and in sales of negotiable paper, there is an implied warranty that the paper is genuine. Markle vs. Hatfield, 2 Johnson's Repts., 459; Breed vs. Cook et al. 15 Ib. 241. But the value of the thing sold, whatever it may be, depending, as it always must, upon accident and opinion, is contingent and speculative; and the simple act of selling will not render the vendor responsible for the value of that which he sold and had a right to sell. It is not the actual value, but the 'prospect of gain to the buj'er and of correspondent loss to the seller, that forms the essence of the true consideration of a contract of sale, without warranty, of a proper subject matter of contract which the seller has a right to sell, and which may be, and is deemed to be, of some value at the date of the contract. Thus, if the owner of a promissory note sell it (in good faith,) without either an assignment or an express warranty, he may recover the promised price, even though the obligor was insolvent, and the note was not, in truth, worth one cent. Triplett vs. Holly, 4 Littell’s Reps., 130; Clark vs. Mundell, 1 Salk, 124; Bank of England vs. Newman 1 L'd, Raym, 442; Hartop vs. Hoare, 3 Atk. 50; Breed vs. Cook et al, supra, 1 Com. on Con. 14, In such a caso, as the *614 note might have been valuable^ and so seemed to be, and' as its value was uncertain, the prospect or chance of its productiveness was a sufficient consideration in fact and in law; because, under such circumstances, the note should be deemed to have been of some adventitious or vendible value to the owner, though it was afterwards found to have been of no intrinsic value; and, therefore, lie should not be deprived of the right to make what he could out of it, by selling it, whilst he .considered it of any value whatever.
The vendor of a horse, without warranty or fraud, will not be responsible to the vendee, even though the horse was so diseased at the date of the sale as not to have been worth any thing.
A vendor of bank stock would surely not be legally liable to the buyer, merely because subsequent disclosures prove that, at the time of the sale, the stock was worth nothing; unless he had been guilty of some fraudulent suggestion, or suppression of a material fact, respecting which it was his duty to make a frank and true communication.
And we presume that, even in the days of South Sea visions, a bona fide vendor of stock in the' memorable South Sea Company, could not have boon legally precluded from recovering the promised price, upon proof merely that the whole scheme was afterwards blown up as an empty bubble, and that, therefore, the stock was not worth a cent at the date of the sale. Such stock actually existed, was vendible, and was sold to the ruin of many vigilant men, all of whom were voluntary adventurers in an unknown ocean of speculation. The visionary prospect of amassing mammoth fortunes operated as a powerful incentive, and the illusion was exposed, only by an explosion that shook the commercial world. But opinion imparted to the South Sea stock a fictitious value, inflated by the very obscurity and remoteness of the scheme of operations, greatly beyond the limits of sober and rational calculation. The stock was, in fact, worth nothing, and the whole scheme, magnificent as it was, eventuated, as an abortion. Nevertheless, we are not acquainted with any authority, or principle of law, which *615 would have exonerated a purchaser of such stock from his obligation to pay the price stipulated by a bona fide contract of sale, in “Exchange Alley,” or elsewhere. As there was such stock, a sale of an interest in it, was a sufficient legal consideration, when both buyer and seller acted in good faith, and on their own speculative opinions, as to the productiveness of the stock and the contingent value of an interest in it.
An invention is a fair subject of sale. And if what has been sold, in- good faith, as such, is in fact an invention, its utility being matter of opinion, contingent, speculative,the transfer of the right to it, is a sufficient consideration to uphold the contract ,for the price, however useless and worthless the invention may prove to be.
A man’s intellect is his best property, and every one has a natural and inviolable right to appropriate to his own use, the productions .of his own industry and the conceptions of his own genius. What is such an original and practical conception, as to be entitled to the denomination of “an invention,” may sometimes be an abstruse metaphysical question. But there can be no doubt that a distinct and organized mode of operation, essentially differing from any preexisting contrivance, in adaptation or design, and which may be applied to any useful or practical end, should be deemed an invention which may belong to the projector; may be valuable, and, therefore, should be vendible. Sound policy requires that such things should be fit subjects of obligatory contract. The right to sell'even the chances incident to an invention, before its practical utility shall have been fully developed, stimulates the inventive energy, and may enable genius to surmount the common obstacles — want of money, and want of friends, and to consummate an important design by means derived from the co-operation of others, who may choose to expend their capital (whether money or labor,) for the prospect of advantage to themselves' individually or society generally. To patronage and success, resulting from such means, mankind are, in no small degree, indebted for some of the most useful achievements of genius: for example, the printing press; the magnetic needle; the steam engine; the discovery of America — itself a new world. If the project fail, the projectors lose the capital expended in experimenting; if it succeed, they gain, and perhaps both fortune and fame. Such a prospect is a fair, legitimate and valuable consideration for the expenditure of money, of labor, or of talents.
Whether the thing sold as an invention was so, or not, is a proper question for a jury.
Where a joint action is bro’t against several, who are only liable separately, and they obtain' an erroneous judgment in bar, that would preclude plaintiff in another suit, it will not be affirmed, because of his first error in pleading; but will be reversed and remanded for new proceedings commencing with that first error.
Whether, in this case, there had been any invention, was a question for the jury to decide, arid which was not concluded by the instruction from the court. If,,as the facts conduced to prove, there was an invention, and Marshall held such an interest in it as that which he sold to Peck, and made the sale in good faith, the transfer of that interest to Peck was a legal and valuable consideration, even though the inutility of the invention, and consequent unproductiveness of the stock, were afterwards experimentally ascertained. If the invention had succeeded, according to the sanguine, but delusive, hopes of the parties, and had yielded to Peck a fortune, the gain would have been his: the correspondent loss Marshall’s. Wherefore, as reciprocity is justice, the abortion should result to Peck’s loss, and Marshall’s gain.
If there was a thing sold, and the sale was uninfected with fraud, the value of the subject matter of the contract is not material to the question of legal liability.— There was a consideration. What a-chancellor might do, or what a jury might be allowed to do, upon a thorough trial, or upon a different issue, this court cannot know or now say. But, presented as the case is by this record, it seems to us, that the circuit court erred in its instruction to the jury.
As the judgment against Marshall, on the merits, would bar a separate suit against either of the covenantors, it must be reversed, although he committed the first error in bringing a joint'action.
Wherefore, the judgment of the circuit court is reversed, and the cause remanded, with instructions to sustain the demurrer to the declaration.